21-CV-1409




KUNTZ, J.
BLOOM, M.J.

**IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF NEW YORK**

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAR 1 2 2021 ★

BROOKLYN OFFICE



RECEIVED

MAR 1 2 2021

PRO SE OFFICE

| | |
|---|---|
| **BENJAMIN SAMUEL RICH, fka SAMUEL GUILLAUME,** | Case No.: |
| Plaintiff, | **Complaint and Jury Demand** |
| v. | |
| **STATE OF NEW YORK, NEW YORK CITY; NEW YORK CITY POLICE DEPARTMENT; NEW YORK COUNTY; NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE; DETECTIVE MICHAEL MILLER, VINCENT CORRANDO, JOHN PASSEMENTI, CYRUS VANCE, JR., SHIPLA KALRA, DAVID NASAR, and DOES 1-100, Inclusive,** | |
| Defendants. | |

## I.    PRELIMINARY STATEMENT / STATEMENT OF CLAIM

1.    This is an action under Title I of the Civil Rights Acts of 1871, 42 U.S.C. § 1983; 42 U.S.C. 1985(3), 42 U.S.C. 1986, 18 U.S.C. § 242, and violations of Plaintiff's rights guaranteed under the First, Fourth, fifth, Sixth, Thirteenth, and Fourteenth Amendments of the United States Constitution, and violations of his rights guaranteed under Article 1 §§ 1, 5, 6, 11, and 12 of the New York Constitution, and other common law and statutory rights.

## II.    PARTIES

2.  Plaintiff Benjamin Samuel Rich, fka, Samuel Guillaume resides in Staten Island, New York.

3.    Defendant the State of New York is a government agency duly organize and existing by virtue of the New York Constitution and the laws of the State of New York.

4.    Defendant the City of New York was and is a municipal corporation duly organized and

1

existing by virtue of the law of the State of New York.

5.    Defendant the New York City Police Department is an agency of the City of New York and organized by virtue of the laws of the State of New York.

6.    Defendant the County of New York is government corporation and agency duly organized by virtue of the laws of the State of New York.

7.    Defendant the New York County District Attorney's Office is a government agency duly organized by virtue of the laws of the State of New York.

8.    Defendant Michael Miller was and is an employee of the New York City Police Department.

9.    Defendant Vincent Corrando was and is an employee of the New York City Police Department, and Det. Miller's supervisor, who approved all reports written in the criminal case related to this instant action.

10.    Defendant John Passementi was and is an employee of the New York City Police Department who authorized DNA tests in the criminal case related to this action.

11.    Defendant Cyrus Vance, Jr., was and is, the elected District Attorney for the County of New York, and was and is an employee of the County of New York.

12.    Defendant Shipla Kalra was and is an employee of the New York County District Attorney's Office.

13.    Defendant David Nasar was and is an employee of the New York County District Attorney's Office.

14.    Plaintiff is ignorant of the true names and or identities of the fictitious defendants, DOES 1-100, and/or their roles, at the time of filing this original, instant actions. Plaintiff, upon information and belief, believe the above-named Defendants did not act alone, and that these DOE Defendants caused and/or contributed his injuries, and are liable for those injuries. Therefore, Plaintiff reserves the right to amend this complaint, if and when, the true names and identities of the DOE Defendants becomes available.

15.    Plaintiff resides in the Kings County in the State of New York.

### III. PROCEDURAL HISTORY

16. On or about January 16, 2018, Plaintiff filed a Personal Injury Claim with the City of New York, Office of the New York City Comptroller, Receipt Number 201800040372, in accordance with the New York Torts Claims Act.

17. On or about March 20, 2020, New York Governor Andrew Cuomo issued Executive Order 202.8, tolling the statute of limitations for the filing of civil actions for 30 days. Gov. Cuomo subsequently tolled the statute of limitations for 30 more days in each Executive Order 202.14, 202.28, 202.38, 202.48, 202.55 and 202.55.1, and 202.60.

18. Gov. Cuomo lifted the stay on civil claims in Executive Order 202.62, effective as of November 4, 2020.

19. Under New York law a 42 U.S.C. § 1983 claim must be brought within the appropriate statute of limitation, which is three (3) years. Thus, based on tolling, Plaintiff's claims are timely.

20. Plaintiff took all necessary steps to fulfill all conditions precedent to the commencement of this lawsuit.

### IV. JURISDICTION AND VENUE

21. This Court has original and subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the action arises from Title I of the Civil Rights Acts of 1871, 42 U.S.C. § 1983; 42 U.S.C. 1985(3), 42 U.S.C. 1986, 18 U.S.C. § 242.

22. This Court has subject matter jurisdiction over the state law claims pursuant of 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy as the federal claims.

23. Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391 because it is the judicial district in which defendants reside; and it is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

## V.     FACTS

**General Background**

24.     On January 6, 2016, Plaintiff Mr. Rich was present at the Highline Ballroom as an invited guest of Ballroom Employee Wasief Quahtan at the venue's employee holiday party.

25.     In the early morning hours of January 6, 2016, Plaintiff was asked to leave the Ballroom after Ms. Quahtan and the Ballroom owner engaged in an argument over Quahtan bringing Plaintiff to the party.

26.     Plaintiff was in the restroom at the time of the argument, and when he returned, he was dumbfounded as to why he was being asked to leave the club by Security and Victim Avery Jackson.

27.     As Plaintiff is being forcibly escorted from the club, Victim Jackson is being belligerent and aggressive toward Plaintiff.

28.     Shortly after Plaintiff is escorted from the club a shooting occurs outside the venue in which shots were allegedly fired toward Victim Avery Jackson.

29.     The shooting was investigated by New York City Police Detective Michael Miller.

30.     Det. Miller interview witness/victim Avery Jackson. Victim Jackson initial told Det. Miller that he saw Plaintiff outside the club, open the trunk of the Rolls Royce, pull out a gun, and shoot in the direction of the Highline Ballroom.

31.     However, Victim Jackson told the first responding police officers, Officer Officers Giacon, Bongvort, and Antonio Guzman, that Plaintiff was escorted from the club because he was intoxicated and that Plaintiff "went to his car, removed a firearm from the vehicle trunk and fired several shots." There is no mention that the gunshots were fired at the club or Victim Jackson. The first responding officer report seeing "multiple shell casing on the street" but not where on the street in relation to the club the casings were seen.

32.     Victim Jackson falsely tells Det. Miller that prior to the shooting, Plaintiff had to be forcibly

ejected from the club after being involved in an altercation with the club manager, that Plaintiff was belligerent with him, and that Plaintiff threatened that he had a gun. Surveillance video obtained during the trial, withheld by the Prosecuting Attorneys for more than eighteen (18) months, shows that Victim Avery was the aggressor toward Plaintiff as he was escorted from the club. Video shows Plaintiff calm, peaceful, and cooperative.

33.     Victim Jackson initially reports to Det. Miller that Plaintiff was being forcibly ejected from the club near the stairwell that led to the back exit, and it is at that time Plaintiff allegedly threatened Victim Jackson that he had a gun and that shots could be thrown Victim Jackson's way.

34.     Det. Miller writes in a subsequent DD-5 report at 11:20 a.m. the day of the shooting that Plaintiff was escorted from the club at the front of the building.

35.     Det. Miller writes in an early report that NYPD personnel canvassed the area for witnesses, and none could be found.

36.     However, there were numerous witnesses, which during his investigation Det. Miller failed to interview and/or disregarded information witnesses provided that contradicted Victim Jackson's account of events. One such witness was the female 911 caller, who lived in an apartment next door to the club, who stated in her call that after she heard shots fired, she witnessed a man jump into a black sedan speeding down the street.

37.     The 911 callers statement completely contradicts Victim Jackson's statement to Det. Miller that when shots were fired Victim Jackson ran back into the club. In fact, Victim Jackson ran down the street and jumped into a black sedan (in the area where the shell casings were found) at the time the shots were fired. Det. Miller failed to investigate and/or follow up with the 911 caller statement, that made it more likely that it was Victim Jackson who fired the shots before jumping into the black sedan to chase Plaintiff down in the white Rolls Royce.

38.     Victim Jackson never told Det. Miller that he ran down the street and jumped in a black sedan

and chased after Plaintiff in the Roll Royce.

39.     Det. Miller, despite being aware of the discrepancies between Victim Jackson's contradictory accounts of what happened inside the club, and what the 911 caller observed, Det. Miller pursued Plaintiff as the only suspect in the shooting rather than a witness or just a person of interest.

40.     During the shooting investigation, Det. Miller obtained Dropcam interior video footage of the club, which completely contradicts Victim Jackson's statement that Plaintiff was involved in a verbal altercation with the manager which led Plaintiff to be forcibly removed from the club.

41.     The interior Dropcam footage shows Victim Jackson being the aggressor, and Plaintiff leaving the club peacefully and the only person being belligerent is Victim Jackson.

42.     During his investigation, Det. Miller also comes into possession of exterior surveillance video outside the club, which further contradicts many of Victim Jackson's statements. Reports by Det. Miller give varying accounts of what Victim Jackson told Det. Miller. In one report, Det. Miller writes that Victim Jackson stated that Plaintiff was parked outside the club, gets out of the car, goes to the trunk, pulls a weapon and fires. Then Det. Miller writes that Victim Jackson say Plaintiff was parked down the street, drives about 40 yards, and stops double parked across from the club, gets out of the car, goes to the truck and pulls a firearm and shoots. In all the varying accounts, Det. Miller embellishes Victim Jackson statement from first just "fires shots," then "fires shots toward" the club, then "fires shots at" Victim Jackson.

43.     The exterior video obtained by Det. Miller actually shows Plaintiff driving away in his white Rolls Royce, and a man jumping into a black sedan, which was parked outside the club, chasing Plaintiff—corroborating the 911 callers detail of events surround the shooting.

44.     Det. Miller used his own added facts and embellished statements on subsequent DD-5s (follow up reports called Unusual Occurrence Reports), on sworn search warrant affidavits to obtain a felony arrest warrant for Plaintiff.

45.     Based solely on Victim Jackson's contradictory statements of events surrounding the shooting, and Det. Miller's embellishment facts, Det. Miller obtained a felony warrant for Plaintiff's arrest on January 10, 2016 for Attempted Murder in the Second Degree (Penal Law §§ 110, 125.25(1), Assault in the First Degree (Penal Law §§ 110, 120.10), and two counts of Criminal Possession of a Weapon (Penal Law §265.03(3), 265.03(1)(b)) based on false, misleading, and/or embellished information not provided to him by Victim Avery.

46.     Det. Miller subsequently obtained a search warrant for Plaintiff's 2011 Rolls Royce on January 9, 2016. The search warrants were obtained based on false, misleading, and/or embellished information in the warrant affidavits by Det. Miller and Victim Avery.

47.     Detective Miller than received two additional search warrants for property found in the vehicles – a cell phone and a Dell laptop computer, on February 12, 2016 and February 15, 2016, respectively. These search warrants also were based on false, misleading, and/or embellished information not provided to him by Victim Avery in his statements to Det. Miller.

48.     During trial Det. Miller admits on the stand that the information contained in DD-5s, the felony arrest warrant, and subsequent search warrant affidavits, all written and signed by him, contained embellished, false and misleading information, for which Det. Miller knew was false.

49.     Det. Miller also failed to investigate the inconsistencies in Victim Jackson's statement, which he knew or should of know was false and contradictory testimony.

50.     Further, Det. Miller, admits to only interviewing Victim Jackson once at the scene of the crime, but Victim Jackson's Grand Jury testimony mirrored the false information placed in Det. Miller's later report, the felony arrest warrant, and subsequent search warrant affidavits. Thus, Det. Miller either lied about having subsequent contact with Victim Jackson, or Victim Jackson was coached by Prosecuting Attorneys to give false testimony to the Grand Jury under direct testimony.

51.     Plaintiff was indicted by a Grand Jury on January 22, 2016, and arrested on January 27, 2016

based on the aforementioned false, misleading, and embellished testimony of Det. Miller and Victim Jackson.

52.     Plaintiff was arrested on January 27, 2016 and did not bail out of jail until February 18, 2016 by posting $50,000.00 cash on $500,000.00 bond while he awaited trial.

53.     Plaintiff was later reincarcerated on or about November 2016 after Jackson falsely reported to the District Attorney that Plaintiff attempted to contact him, thus the judge deemed Avery's false statement as tampering with a witness.

54.     Plaintiff as incarcerated for eight-and-half (8-1/2) months before going on trial on or about June 5-6, 2017.

**The Trial, Avery Perjury, Det. Miller's False and Misleading Reports, Withheld Video**

55.     On January 6, 2016, Plaintiff Mr. Rich was present at the Highline Ballroom as a guest for a holiday employee party.

56.     At some point during the evening Plaintiff was asked to leave the club based on false statements from Victim Jackson that Plaintiff was involved a verbal altercation with the club manager. In fact, Plaintiff went to the restroom and as he returned, the female friend who he accompanied to the party, Wasief Quahtan, was involved in a verbal altercation with the owner. Quahtan was involved in a romantic relationship with the owner, and the owner was angry that she brought Plaintiff to the party. It was this conflict between Quahtan, and the manager's anger, that resulted in Victim Jackson and club security asking Plaintiff to leave the club.

57.     Victim Jackson falsely tells police that Plaintiff is angry, screaming, and threatened that he had a gun, and that shots could be thrown his way.

58.     Victim Jackson falsely tells police that Plaintiff became combative and had to be physical removed from the club by security and as security escorted Plaintiff out of the club, Plaintiff further threatened him as to shots being thrown his way.

59.     Shortly after Plaintiff was escorted from the club a shooting occurs outside the club.

60.     Numerous New York City police officers as well as Det. Miller of the 10th Precinct were dispatched to the scene.

61.     Two NYPD Officers take Victim Jackson's initial statement and Det. Miller takes a second statement from Victim Jackson, which do not match his first account of events leading up to the shooting.

62.     Victim Jackson falsely tells police that at about 2:00 a.m. when he was standing outside the club, he saw Plaintiff get out of his white Rolls Royce, open the truck, pull out a gun, and fire shots. Later accounts in Det. Millers reports say fire shots toward the club, and then fired shots toward Jackson.

63.     Victim Jackson's initial accounts of the events told to Det. Miller are not corroborated by other witnesses, and video surveillance tapes that are not turned over to Plaintiff's Defense Attorneys by the prosecuting District Attorneys – Nasar and Kalra-- until five days *into* Plaintiff's second-degree attempted murder trial.

64.     Prosecuting Attorney David Nasar and Assistant District Attorney Shipla Kalra initially turned over some video to the Defense on or about March 26, 2016, but the video is only one (1) camera angle of 14 camera angles. The additional 13 video footage/angles were not turned over to the Defense until June 9, 2017 – seven (7) days after Plaintiff's criminal trial began – eighteen (18) months after they were collected from the Highline Ballroom management.

65.     During trial, Victim Jackson testified that  Plaintiff got into his white Rolls Royce, drove it down the block, then got out of the vehicle, opened the truck, and started firing shots toward him.

66.     The additional interior surveillance video turned over to Defense on June 9, 2017, completely contradicts Victim Jackson's statement of events that led up to the shooting outside the club. Specifically, the video shows that Plaintiff was never involved in a verbal altercation with the club

manager, nor did he have to be forcibly removed from the premises. The video further show that Victim Jackson is the belligerent aggressor not Plaintiff.

67.     Plaintiff always maintained that he was not argumentative toward anyone, yet he was violently and forcibly escorted out of the club. Plaintiff always maintained that he left the club, got into his Rolls Royce and drove off. Further, Plaintiff was unaware of anything happening outside the club until he noticed someone chasing behind him.

68.     Victim Jackson never told Det. Miller that when Plaintiff drove off in his Rolls Royce that he ran down the street, jumped into a black sedan and began chasing the Plaintiff.

69.     Det. Miller never questions Victim Jackson about the 911 caller statement, who reported after hearing shots she witnessed from her apartment widow a black sedan speeding away.

70.     Further, Prosecutors tried to discount the 911 callers account of events to Defense Attorneys stated that she was not willing to talk and the black sedan she mentioned was a detective car, when in fact, no detectives were on scene until after her 911 call.

71.     At trial, it is later revealed by the Prosecuting Attorney, who are under pressure after the Court discovers Victim Jackson's false statements, that Victim Jackson owned a black sedan that was parked outside the club the night of the shooting.

72.     Further, Victim Jackson testifies at trial that he ran down the street, jumped into the black sedan in chase of Plaintiff in the white Rolls Royce.

73.     The second surveillance video obtained by Det. Miller during the shooting investigation of the exterior of the club, also does not support Victim Jackson's account that Plaintiff was in his Rolls Royce when he exited the club, that Plaintiff got out of the vehicle, opened the truck, pulled out a gun, and fired at him. The video clearly shows Plaintiff driving off and the black sedan chasing the Plaintiff's Rolls Royce. Det. Miller never investigates what is seen on the video.

74.     Det. Miller fails to investigate all the discrepancies in Victim Jackson's statements based on

other witness statements, and what is seen on both the interior and exterior surveillance videos and takes Victim Jackson's statements at face value.

75.     Further, at trial it is revealed that NYPD and/or Prosecutors Nasar and ADA Kalra were in possession of the additional surveillance video nearly eighteen (18) months prior to the start of Plaintiff's trial but did not turn it over to Defense until June 5, 2017, in the middle of trial.

76.     After Prosecutors turn over the additional surveillance video to Defense, on June 9, 2017, the Judge questions Victim Jackson outside the Jury.

77.     Victim Jackson pleads the 5th Amendment not to incriminated himself, and the Judge appoints him counsel.

78.     To compound the revelation that Prosecutors withheld relevant and exculpatory video surveillance until a week into Plaintiff's trial, and the false testimony Victim Jackson gave during trial and to the Grand Jury, Det. Miller admits in testimony that he embellished or misrepresented statements and facts on subsequent DD-5s (Unusual Occurrence Reports), that were used to obtain a felony arrest warrant for Plaintiff and used in sworn affidavits by Det. Miller to obtain search warrants on Plaintiff's vehicle, cell phone, and laptop computer.

79.     Det. Miller also testifies that he only interviewed Victim Jackson once after the shooting, but Victim Jackson's trial testimony and Grand Jury testimony, matches almost exactly Det. Miller's embellished and misleading information provided on these later DD-5s and search warrant affidavits.

80.     Det. Miller further testifies and admits under cross examination that the DNA evidence found at the scene of the shooting (found on shell casings) did not match Plaintiff.

81.     When the DNA did not match Plaintiff, NYPD reopened the shooting case, but Prosecutors continued to prosecute Plaintiff, despite the lack of physical evidence to tie him to any part of the shooting.

82.     Det. Miller further testifies that five shell casings and one bullet fragment recovered at the

scene of the shooting were found in front of the venue. In fact, Det. Miller omits from his testimony that the bullet casings and fragments were not recovered from in front of the venue, but down the street from the club near 8th and 9th Street.

83.     Det. Miller admits in testimony that the bullet casings were actually recovered from the area down the street from the club, which turns out to be where the black sedan was parked, and where Victim Jackson ran to, jumped into the black sedan, and started chasing Plaintiff's white Rolls Royce.

84.     Further, evidence shows NYPD investigators did not find bullet holes anywhere near the front of the club where Victim Avery reported the shooting occurred.

85.     Det. Miller further testifies the only other person he interviewed at the shooting was Wasief Quahtan, Plaintiff's friend who had invited him to the employee party at the club.

86.     The night of the shooting, after Witness Quahtan identified Plaintiff by name, Det. Miller located a DMV photo of Plaintiff and showed it to Quahtan to confirm his identify, identifies Plaintiff's vehicles from the DMV, and pursues him as the only suspect in the case.

87.     Quahtan never told Det. Miller that Plaintiff put a gun in the trunk of his vehicle before they entered the club the evening of the shooting.

88.     Witness Quahtan states she only told Det. Miller that she came to the party with Plaintiff and did not see the shooting, nor did she ever tell Det. Miller that she saw Plaintiff in possession of a firearm before they entered the party the night of the shooting.

89.     Det. Miller again admits during trial testimony that Quahtan never told him that she saw Plaintiff in possession of a weapon the night of the shooting.

90.     Despite contradictory video evidence, despite Victim Jackson's suspect account of the events surround the shooting, despite the contradictor accounts of the 911 caller, despite the DNA evidence recovered at the shooting did not match Plaintiff, despite no weapon was ever recovered from Plaintiff after the execution of search warrants, Det. Miller focused on Plaintiff as the only suspect,

and the District Attorney's Office pursued Plaintiff, arrested Plaintiff, and incarcerated Plaintiff.

91.     Not only was a gun never recovered, but no gun shot residue, or any evidence of a gun was found in and around Plaintiff's Rolls Royce, including the trunk of the car.

92.     Further, in pursing Plaintiff as the only suspect in the shooting, on January 10, 2016, Det. Miller showed Victim Jackson a photoshop photo array of six men, which included Plaintiff's mugshot – for which Plaintiff's mugshot had a lighter background than then other photographs. Victim Avery picked Plaintiff's mugshot out of the photo array.

93.     On or about January 27, 2016, Plaintiff was arrested in New Jersey by Detective Miller after being located by the felony apprehension team.

94.     A few days later, in a lineup at the 10th Precinct where Plaintiff is the only bald man in the lineup, police had all the fillers put on blue hats, which did not mask the fact that they were not bald. Further, Plaintiff was the only dark-skinned black man in the lineup.

95.     Defendant Vincent Corrando was and is an employee of the New York City Police Department, and Det. Miller's supervisor, who approved all reports written in the criminal case related to this instant action and should have notice or known of all the inconsistencies and contradictory statements in Det. Miller's initial police reports, DD-5s, and search warrant affidavits.

96.     Defendant John Passementi was and is an employee of the New York City Police Department who authorized DNA tests in the criminal case related to this action for which it was learned that DNA evidence recovered at the scene of the did not match Plaintiff.

97.     Defendants Miller, Passementi, Corrando, and other defendants unknown by name to Plaintiff, willfully, maliciously and intentionally fabricated statements of witnesses, ignored evidence, or the lack thereof, against Plaintiff, and used that fabricated to pursue a wrongful conviction against Plaintiff.

**Mistrial and Dismissal of Case**

98.     Based on Victim Jackson's perjured testimony, and Det. Miller's embellished and false

information provided on police reports, DD-5s, and search warrant affidavits as well as the new video surveillance Prosecuting Attorney's disclosed after trial began, the judge in this case declared a mistrial.

99.     After the mistrial, Prosecutor Nasar, who was visibly angry, threatened Plaintiff that he was going to "get you," referring to Plaintiff.

100.    Based on Victim Jackson's perjured testimony, and Det. Miller's embellished and false information provided on police reports, DD-5s, and search warrant affidavits as well as the new video surveillance Prosecuting Attorney's disclosed after trial began, Plaintiff's Defense Attorney's filed a Motion to Dismiss the case.

101.    Plaintiff's Motion to Dismiss was granted in October 2017.

**Plaintiff's Incarceration and Damages**

102.    After Plaintiff was arrested on January 27, 2016, he spent approximately three (3) weeks in jail before he was able to raise $50,000.00 to bond out on the $500,000.00 bail set.

103.    Prior to trial, Plaintiff's bond was revoked on or about November 2016 for allegedly tampering with a witness after Victim Avery provide a false statement to the District Attorney that Plaintiff tried to call Avery.

104.    Plaintiff was remanded into custody at the MDC Manhattan Detention Complex in November 2016 and spent approximately eight-and-a-half (8-1/2) months in jail until the case was dismissed in October 2017.

**Plaintiff's Property Damage**

105.    As a result of Det. Miller's investigation into Plaintiff has the only suspect in the shooting, Det. Miller obtained a search warrant for Plaintiff's 2011 Roll Royce on January 9, 2016.

106.    Plaintiff's 2011 Rolls Royce was impounded by police on January 11, 2016.

107.    When the vehicle was impounded NYPD officers were offered the key fob for the Rolls

Royce to gain access to it. The declined to take the key fob.

108.     When NYPD personnel searched Plaintiff's Rolls Royce for evidence, they used the Jaws of Life or some other type of forceable entry tools to gain access to the trunk of the vehicle causing extensive damage.

109.     NYPD kept Plaintiff 2011 Rolls Royce impounded for more than four (4) months and stored the vehicle in an outside storage facility with the truck open. Due to this willful negligence, the vehicle sustained severe water and rust damage.

110.     Damage to Plaintiff's vehicle was in excess of $10,000.00.

**Plaintiff's Attorney Fees and Costs, and Other Damages**

111.     As a direct and proximate result of Plaintiff's false arrest, false imprisonment, and malicious prosecution, Plaintiff incurred attorney fees costs, bail costs, and property damage.

112.     Plaintiff has paid in excess of $216,000.00 in attorney fees and cost.

113.     Plaintiff was arrested on January 27, 2016 and spent approximately three (3) weeks in jail until he was bonded out on a $30,000.00 cash bond.

114.     Plaintiff's has suffered property/vehicle was damaged in excess of $10,000.00.

115.     As a direct and proximate result of the wrongful arrest, charges, malicious prosecution, and wrongful imprisonment, Plaintiff has suffered emotional distress and mental anguish, physical injuries, pain and suffering.

116.     As a direct and proximate result of the wrongful arrest, charges, malicious prosecution, and wrongful imprisonment, Plaintiff has suffered embarrassment, humiliation, shame, indignity, degradation, loss of quality of life, loss of employment opportunities, and related income.

## VI.     CAUSES OF ACTION

### COUNT 1
**(Against ALL Defendants)**
**Right to be Secure From Unreasonable Search and Seizures**
**42 U.S.C. § 1983 – Fourth Amendment; Art. 1 §§ 2, 5, 6, 8, 11, 12 New York Constitution**

117. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

118. Defendants and their employees and agents violated Plaintiff's Fourth Amendment rights to be free from unreasonable search and seizure of property by confiscating and then damaged Plaintiff property based on false and misleading information on police reports, DD-5s, and search warrant affidavits.

119. Defendants and their employees and agents violated Plaintiff's rights to be free from false arrest, when they arrested him without fully investigating the case, disregarded witness testimony, surveillance evidence, and DNA evidence.

120. These unlawful actions were done with the specific intent to deprive Plaintiff of his constitution rights.

121. Plaintiffs are informed and believe that the acts of the Defendants, their employees and agents, were intentional, willful and with malice in failing to protect and preserve Plaintiff's person and property and that, at a minimum, Defendants were deliberately indifferent to the likely consequence that the property would be seized and damaged unlawfully, based on past circumstances of similar constitutional and statutory violations of law.

122. AS a direct and proximate consequence of these unlawful acts, Plaintiff has suffered and continues to suffer loss of his personal property and is entitled to compensatory damages for his personal injury.

**COUNT 2**
**(Against ALL Defendants)**
**Deprivation of Rights – False Arrest / False Imprisonment**
**42 U.S.C. § 1983, Art. 1 §§ 5, 6, 8**

123. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

124. Plaintiff was falsely arrested for attempted second degree murder despite evidence to the contrary that he was not the party who fired the shots.

16

125.    Defendants and their employees and agents violated Plaintiff's rights to be free from false arrest, when they arrested him without fully investigating the case, by disregarded witness testimony, surveillance evidence, and DNA evidence.

126.    These unlawful actions were done with the specific intent to deprive Plaintiff of his constitution rights.

127.    As a direct and proximate consequence of the acts of Defendants, and Defendants' agents, and employees, Plaintiff has suffered, and continues to suffer injury and damages, including but not limited embarrassment, humiliation, shame, indignity, degradation, loss of quality of life, loss of employment opportunities, and related income.

**COUNT 3**
**(Against ALL Defendants)**
**42 U.S.C. § 1983 - Malicious Prosecution**

128.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

129.    Defendants, and all of them, in bad faith, knew or should have known there was no probable cause to believe Plaintiff was accused of what he was arrested and incarcerated for.

130.    Defendants, and all of them, acted in bad faith by failing to properly investigate witness statements, contradictions in the Victim's statement, concealed evidence, and ignored evidence, and then provided false and misleading information to a Grand Jury; and provided false and misleading information in sworn search warrant affidavits, they knew or should have known was not true.

131.    These unlawful actions were done with the specific intent to deprive Plaintiff of his constitution rights.

132.    As a direct and proximate consequence of Defendants' actions, and all of them, Plaintiff suffered damages, including but not limited embarrassment, humiliation, shame, indignity, degradation, loss of quality of life, loss of employment opportunities, and related income.

## COUNT 4
### (Against ALL Defendants)
### Right to Due Process of Law
### 42 U.S.C. § 1983; Fifth and Fourteenth Amendments; Art. 1 §§ 2, 5, 6, 8

133.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

134.    Defendants, their employees and agents, owned Plaintiff a duty under the due process clauses of the Fifth and Fourteenth Amendments to the U.S. Constitution and Article I, §§ 2, 5, 6, 8 of the New York Constitution.

135.    Despite this well-defined duty,  Plaintiff was deprived of his rights to life and liberty, the right to a fair trial, all of which were stripped from him when he was arrested and falsely accused of the above crimes, he was incarcerated based on false statements, misinformation, and concealed facts and evidence presented as direct evidence at a Grand Jury; incarcerated based on false information on sworn search warrant affidavits; and incarcerated without fully investigating all witnesses, and ignoring evidence of Plaintiff's innocence.

136.    These unlawful actions were done with the specific intent to deprive Plaintiff of his constitution rights.

137.    As a direct and proximate consequence of the acts of Defendants, and Defendants' agents, and employees, Plaintiff has suffered, and continues to suffer injury and damages, including  but not limited embarrassment, humiliation, shame, indignity, degradation, loss of quality of life, loss of employment opportunities, and related income.

## COUNT 5
### (Against ALL Defendants)
### Deprivation of Rights – Conspiracy to Interfere with Civil Rights
### 42  U.S.C. 1985(3), Art. 1 §§ 5, 6, 8, 11, 12

138.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

139.    Defendants, their employees and agents, and all of them, engaged in a pattern and practice in the furtherance of a conspiracy to falsely arrest and attempted to convict Plaintiff of the

aforementioned crime, whereby they injured Plaintiff, his person, his property, and deprived him of having and/or exercising the rights and privileges as a citizen of the United States; deprive him of equal protections under the law, and deprive him of equal privileges and immunities under the law.

140.    Defendants, and all of them, conspired, by providing false and misleading information to a Grand Jury; conspired by signing under oath false and misleading information on search warrant affidavits; conspired by concealing evidence and giving false testimony at trial, and conspired to ignore evidence of Plaintiff's innocence. resulting in Plaintiff's wrongful arrest and incarceration.

141.    These unlawful actions were done with the specific intent to deprive Plaintiff of his constitution rights.

142.    As a direct and proximate consequence of Defendants' actions, and all of them, Plaintiff suffered damages, including  but not limited embarrassment, humiliation, shame, indignity, degradation, loss of quality of life, loss of employment opportunities, and related income.

### COUNT 6
### (Against ALL Defendants)
### Deprivation of Rights – Failure to Prevent Wrongful Acts
### 42  U.S.C. 1986, Art. 1 § 6, 11, 12

143.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

144.    Defendants, their employees and agents, and all of them, engaged in a pattern and practice in the furtherance of a conspiracy, having the power to prevent or aid in the prevention of the aforementioned injustice, negligence, and refused to stop the wrongful acts.

145.    Defendants, and all of them, conspired, by providing false and misleading information to a Grand Jury; conspired by signing under oath false and misleading information on search warrant affidavits; conspired by concealing evidence and giving false testimony at trial, resulting in Plaintiff's wrongful arrest and incarceration; and conspired to ignore evidence of Plaintiff's innocence.

146.    These unlawful actions were done with the specific intent to deprive Plaintiff of his constitution rights.

147.   As a direct and proximate consequence of Defendants' actions, and all of them, Plaintiff suffered damages, including   but not limited embarrassment, humiliation, shame, indignity, degradation, loss of quality of life, loss of employment opportunities, and related income.

### COUNT 7
### (As to ALL Defendants)
### 18  U.S.C. 245 - Deprivation of Rights Under the Color of Law

148.   Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

149.   Defendants, and all of them, including but not limited to, Detective Miller, and other New York City Police Department personnel as well as New York County District Attorneys Nasa and Kalra were supposed to be performing the required duties and responsibilities of their jobs when under the color of law they ignored evidence, tampered with evidence, withheld evidence, among other things, that would have cleared Plaintiff of the crime for which he was accused, arrested, and stood trial.

150.   These unlawful actions were done with the specific intent to deprive Plaintiff of his constitution rights.

151.   As a direct and proximate result of Defendants' actions, and all of them, Plaintiff was deprived of his rights to a fair trial; and deprived of his property, life and liberty.

As a direct and proximate consequence of Defendants' actions, and all of them, Plaintiff suffered damages, including  but not limited embarrassment, humiliation, shame, indignity, degradation, loss of quality of life, loss of employment opportunities, and related income.

### COUNT 8
### (Against ALL Defendants)
### 42 U.S.C. § 1983 - Abuse of Process

152.   Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

153.   Defendants, their employees and agents, and all of them, engaged in a pattern and practice in the furtherance of a conspiracy against Plaintiff, and used the duties and powers within the law

enforcement community, the district attorney's office, and court system, to enable the wrongful arrest, incarceration, and prosecution of Plaintiff, based on witness statements, other facts, and evidence, they knew or should have known was false.

154.   Defendants, and all of them, knowingly, intentionally, willfully and maliciously provided false and misleading information to a Grand Jury; signing under oath false and misleading information on search warrant affidavits; concealed evidence; produced false evidence, that led to Plaintiff's wrongful arrest, incarceration, and prosecution.

155.   These unlawful actions were done with the specific intent to deprive Plaintiff of his constitution rights.

156.   As a direct and proximate consequence of Defendants' actions, and all of them, Plaintiff suffered damages, including   but not limited embarrassment, humiliation, shame, indignity, degradation, loss of quality of life, loss of employment opportunities, and related income.

## COUNT 9
### (Against ALL Defendants)
### 42 U.S.C. 1983 - Fraudulent Misrepresentation

157.   Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

158.    Defendants, and all of them, knowingly, intentionally, willfully and maliciously provided fraudulent misrepresentations of witness statements and evidence to deprive Plaintiff's off his rights under the Constitutions of the United States and the State of New York.

159.   As a direct and proximate consequence of Defendants' false misrepresentations Plaintiff was arrested, incarcerated and faced trial for a crime he did not commit.

160.   Defendants' fraudulent misrepresentations included providing false and misleading information to a Grand Jury; signing under oath false and misleading information on search warrant affidavits; concealing and/or ignoring evidence; producing false evidence and giving false testimony.

161.   Defendants' aforementioned actions show they breached their duty of care, and

responsibilities as law enforcement officers and district attorneys.

162.    These unlawful actions were done with the specific intent to deprive Plaintiff of his constitution rights.

163.    As a direct and proximate consequence of Defendants' actions, and all of them, Plaintiff suffered damages, including  but not limited embarrassment, humiliation, shame, indignity, degradation, loss of quality of life, loss of employment opportunities, and related income.

## COUNT 10
### (Against ALL Defendants)
### Negligent Misrepresentation

164.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

165.    Defendants, and all of them, had a duty, as result of their special relationships as law enforcement officers, district attorneys, officers of the court, to conduct a thorough investigation, and not to present false testimony and evidence, that they knew or should have known was incorrect, and these false and misleading negligent misrepresentation were relied upon to Plaintiff's detriment.

166.    These unlawful actions were done with the specific intent to deprive Plaintiff of his constitution rights.

167.    As a direct and proximate consequence of Defendants' actions, and all of them, Plaintiff suffered damages, including  but not limited embarrassment, humiliation, shame, indignity, degradation, loss of quality of life, loss of employment opportunities, and related income.

## COUNT 11
### (Against ALL Defendants)
### Other Negligence-Personal Injury

168.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

169.    Defendants, and all of them, owed Plaintiff a duty of care, to thoroughly investigate the crime, to follow the evidence, to present true and correct witness statements and testimony, and true and correct evidence.

170.    Defendants, and all of them, breached their duty of care, when they failed to investigate and ignored contradictory witness accounts, and ignored evidence.

171.    These unlawful actions were done with the specific intent to deprive Plaintiff of his constitution rights.

172.    As a direct and proximate consequence of Defendants' actions, and all of them, Plaintiff suffered damages, including   but not limited embarrassment, humiliation, shame, indignity, degradation, loss of quality of life, loss of employment opportunities, and related income.

## COUNT 12
### (Against ALL Defendants)
### Other Negligence-Property Damage

173.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

174.    Defendants, and all of them, owed Plaintiff a duty of care, to care for and maintain Plaintiff's property – his 2011 white Rolls Royce when it was impounded as the result of a questionable search warrant.

175.    Defendants, and all of them, breached that duty of care, when they kept the vehicle impounded for more than four (4) months in an outdoor storage facility with the truck open, resulting in severe water and rust damages to the vehicle.

176.    Defendants, and all of them, knew, or should have known their actions would result in damage to Plaintiff's property.

177.    As a direct and proximate consequence of Defendants' actions, and all of them, Plaintiff suffered damages to his property.

## COUNT 13
### (Against ALL Defendants)
### Negligent Hiring, Training, Supervision, and Discipline of Officers

178.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

179.    Defendants, and all of them, engaged in a pattern and practice to commit the aforementioned

unlawful acts, and the employers were aware of, or reasonably should have foreseen, the Defendants' propensity to commit such acts.

180.     The above factual allegation show that Defendants were aware that their employees, officers, and agents were aware of the acts committed outside the scope of Defendants' employment, and the employees failed to act to stop such unlawful acts.

181.     As a direct and proximate consequence of Defendants' actions, and all of them, Plaintiff suffered damages, including  but not limited embarrassment, humiliation, shame, indignity, degradation, loss of quality of life, loss of employment opportunities, and related income.

## COUNT 14
### (Against ALL Defendants)
### Negligent Infliction of Emotional Distress

182.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

183.     Based on the aforementioned factual allegations, Defendants, and all of them breached the duty owed to Plaintiff to properly investigate the crime, to not fabricate evidence, to not provide false and misleading information and statements in sworn search warrant affidavits, to not give false and misleading direct testimony to a grand jury; and to not ignore evidence that exonerated Plaintiff.

184.     Defendants' breach of duty unreasonably endangered Plaintiff's physical safety and/or caused Plaintiff fear for his physical safety due to his incarceration. And Defendants' aforementioned factual breach was extreme and outrageous.

185.     As a direct and proximate consequence of Defendants' actions, and all of them, Plaintiff suffered damages, including  but not limited embarrassment, humiliation, shame, indignity, degradation, loss of quality of life, loss of employment opportunities, and related income as well as damages to his emotional and psychological health.

## VII.   RECOVERY OF ATTORNEY FEES AND COSTS

186.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

187.     Plaintiff is entitled to recover his attorney fees' and costs pursuant to provisions of Title I and New York Law.

188.          Plaintiff is entitled to an award of attorney fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq*.

## VIII.   JURY DEMAND

189.     Plaintiff hereby demands a trial by jury of all issues triable by jury.

## IX.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A.  Declare that the acts, practices, and omissions complained of herein are unlawful and violate Title I and the New York and United States Constitutions;

B.  Order other affirmative relief necessary to eradicate the effects of Defendants' unlawful practices;

C.  Direct Defendants to pay for past and future compensatory pecuniary and non-pecuniary losses resulting from the unlawful practices complained of in the foregoing paragraphs, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation, in an amount to be determined at trial;

D.  Direct Defendants to pay Plaintiff front and back pay, in an amount to be determined at trial;

E.  Direct Defendants to pay Plaintiff for the property damaged caused by the illegal search and seizure of his vehicle.

F.  Award Plaintiff's attorneys' fees, costs, and disbursements as provided by law; and

G.  Award such additional relief as justice may require.

Dated: March 8, 2021

Respectfully Submitted,

**BENJAMIN SAMUEL RICH**

Benjamin Samuel Rich
700 Victory Boulevard
Staten Island, NY  10301
Tele: (201) 281-1861
Email:
benrich777@gmail.com

*Plaintiff In Pro Se*

26

## X.    <u>Certification and Closing</u>

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A. For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: March 8, 2021.

Signature of Plaintiff _____

Printed Name of Plaintiff : _____ Benjamin Samuel Rich _____

## <u>ATTACHEMENT TO CIVIL CASE COVER SHEET</u>

## <u>DEFENDANTS' ADDRESSES:</u>

1. State of New York
   c/o Attorney General
   28 Liberty Street
   New York NY 10005
2. New York Police Department
   1 Police Plaza
   New York NY 10038
3. The City of New York
   c/o  NYC Department of
   Finance
   66 John Street Room 104
   New York NY 10038
4. Det. Michael Miller
   1 Police Plaza
   New York NY 10038
5. Vincent Corrando
    1 Police Plaza
   New York NY 10038
6. John Passementi
   1 Police Plaza
   New York NY 10038

7. New York County
   60 Centre Street, Room 161
   New York NY 10007
8. New York County District
   Attorney's Office
   1   Hogan Plaza
   New York NY 10013
9. Cyrus Vance Jr.
   1 Hogan Plaza
   New York NY 10013
10. Shipla Kalra
    1 Hogan Plaza
    New York NY 10013
11. David Nasar
    1 Hogan Plaza
    New York NY 10013